J. W. LAHART, Appellant, v. MINNESOTA GRAIN COM-PANY, a Corporation, Respondent.

(170 N. W. 328.)

**Accounting — action for — evidence — judgment.**

In an action for accounting, evidence examined and *held* to sustain the judgment.

Opinion filed April 13, 1918. Rehearing denied November 30, 1918.

From a judgment of the District Court of Foster County, *Coffey*, J., plaintiff appeals.

Affirmed.

*Maddux & Rinker* and *George H. Stillman,* for appellant.

"Where it is apparent from the pleadings that a record or instrument will be necessary on the trial, as the best evidence, no previous demand is necessary." Owens v. Bemus, 22 N. D. 158, with point squarely stated on page 168.

Books and accounts made up from other and original records by bookkeepers are not the best evidence, and it is error to admit them over objection, and especially where demand is made for the original entries and accounts, and their production is refused. Kayo v. Taylor, 28 N. D. 293; Sykes v. Beck, 12 N. D. 242.

A litigant, having in his possession the primary or original record,

cannot establish his contention by parol evidence or unauthenticated copies or posted records. Hurley v. St. Paul, 86 N. W. 427; Sykes v. Beck, supra; Monton v. Ry. 128 Ala. 537; Mason v. Bull, 26 Ark. 164; Adams v. Trustees, 37 Fla. 266; Chicago v. McGraw, 75 Ill. 566; Mandel v. Land Co. 154 Ill. 177; Downing v. Haston, 21 Kan. 178; Bank v. Bowen, 19 Ky. L. Rep. 1416; Avery v. Butters, 11 Me. 404; Reppy v. County, 47 Mo. 66; Vale v. School Dist. 75 N. W. 855.

It is only where the best evidence is out of control of the party and he is unable to produce it, that substitute or secondary evidence is admissible. Company v. Cannon, 31 Fed. 313; Bogan v. McCutcheon, 48 Ala. 393.

*James R. Manly* and *Alvord C. Egelston,* for respondent.

"Every contract by which the possession of personal property is transferred as security only is to be deemed a pledge." Comp. Laws 1913, § 6771; 31 Cyc. 787.

The rights and obligations of the parties to a pledge may be modified indefinitely by special contract between them. Jones, Collateral Securities—Pledges, § 14.

In this, as in all other cases of contracts, the courts will endeavor to ascertain the intention of the parties, and give effect thereto. 31 Cyc. 788; Dungan v. Mutual etc. Ins. Co. 38 Md. 242; Jones, Collateral Securities, Pledges, note to § 9; Palmer v. Mutual L. Ins. Co. 114 Minn. 1.

Entries in partnership books are admissible as between partners, and are also competent in favor of third persons in actions against the partners, in the nature of admissions of the facts stated. 2 Enc. Ev. 667.

CHRISTIANSON, J. This is an action for an accounting. Plaintiff was engaged in the elevator business. He owned and operated two elevators individually; and the Gribbin-Alair Grain Company, a co-partnership in which plaintiff had a one-third interest, owned and operated seven other elevators. Both plaintiff and the copartnership were indebted to the defendant for moneys borrowed from it. The plaintiff individually owed the defendant something over $30,000. On June 7, 1907, for the purpose of securing the payment of $10,000

of such indebtedness, the plaintiff executed and delivered to the defendant the following written instrument:

I, J. W. Lahart, for and in consideration of the sum of ten thousand ($10,000) dollars in hand to me paid by the Minnesota Grain Company of Minneapolis, Minnesota, do hereby sell, assign, and transfer to the Minnesota Grain Company all my interest and share in the elevators now operated and owned in North Dakota by the Gribbin-Alair Grain Company, my interest being the one-third interest, the said elevators being situated in the following towns in North Dakota, to wit: New Rockford, Sykeston, Hurdsfield, Heaton, Bowdon, Denhoff and Jud.

That the Gribbin-Alair Grain Company is incorporated under the laws of the state of North Dakota, and owner of the elevators in the above-described towns, and is incorporated for the sum of $60,000, and I am the owner of one-third interest in the incorporation, but that the stock has never been issued to me, and I hereby authorize the Gribbin-Alair Grain Company to issue the stock which should be issued to me in the due course of business, and at the time they should be issued, to the Minnesota Grain Company or its assigns.

Dated this 7th day of June, 1907.

J. W. Lahart.

Signed in the presence of R. F. Rinker, Olive Couch.

He also turned over to the defendant the two elevators owned by plaintiff individually, for which it was agreed he was to receive a consideration of $13,650. The balance of such individual indebtedness, plaintiff paid.

This controversy arises over the elevators mentioned in the written agreement above set forth. The Gribbin-Alair Grain Company was originally a copartnership consisting of the plaintiff, Thos. Gribbin, and E. E. Alair, each of whom owned a one-third interest in the partnership. Later they determined to incorporate the firm, each member to receive an equal amount of corporate stock. It appears that prior to the execution of such agreement the Gribbin-Alair Grain Company had been duly incorporated under the laws of this state, but no capital stock had been issued. After the execution and delivery

41 N. D.—8.

of the assignment to the defendant, the respective stockholders met and perfected a corporate organization, issued stock, and elected officers. The Gribbin-Alair Grain Company owed a considerable amount to the defendant. It also was indebted to P. B. Mann Company, which indebtedness was taken over by the defendant.

The Gribbin-Alair Grain Company continued in business for some time. But eventually it disposed of all its elevators, and converted its assets into cash. No complaint is made with respect to the sale of the assets of the company, but plaintiff asks for an accounting of the moneys realized from such sale and from the operation of such elevators while retained by the Gribbin-Alair Grain Company, including proceeds from the sale of grain on hand at the time plaintiff assigned his interest to the defendant.

It is undisputed that plaintiff owned a one-third interest in the Gribbin-Alair Grain Company, and that this interest was assigned to the defendant to secure a $10,000 debt which plaintiff owed to the defendant. Hence, it is conceded that the defendant is entitled to retain $10,000 and legal interest thereon out of plaintiff's distributive share of the assets of the Gribbin-Alair Grain Company. But plaintiff contends that defendant has received not only sufficient to discharge such indebtedness, but a sum considerably in excess thereof.

At the close of the trial, the trial court summarized the facts as follows: "On or about June 7, 1907, Mr. Lahart was personally indebted to the Minnesota Grain Company, in the sum of something over $30,000. Two elevators in Warvick and McVille not owned by the partnership of Gribbin-Alair Grain Company were turned into the Minnesota Grain Company, at an agreed price of about $13,650. At the same time there was cash paid, at one time of about $750, proceeds of grain from the elevators at McVille and Warvick, and another check of about $4,000 from the same source, or from some cash of Tom Lahart personally. In addition to that, Mr. Lahart assigned or authorized to be issued stock in the Gribbin-Alair Grain Company to the extent of $10,000. That stock was issued and came into the possession of the Minnesota Grain Company and defendant. It seems to be clear and conceded that these payments wiped out and canceled and discharged the personal indebtedness of J. W. Lahart, the plaintiff, to the Minnesota Grain Company. That is shown and

seems to be conceded in the evidence taken here about a year ago. At about the same time, June 7, 1907, Gribbin-Alair Company paid the P. B. Mann Company about $6,000. To discharge that indebtedness, the Gribbin-Alair Company authorized the closing out of the grain which was owned by them, the turning over to the Minnesota Grain Company of the proceeds of the grain in the elevator, and the value of the buildings, the elevator buildings at seven different points; stated in exhibit C. And it was understood that the business should be closed out conveniently, and it seems that it was closed out on or before January 1, 1908. So far as the evidence in this case discloses, there was at that time, January 1, 1908, owned in the way of equities $36,548.68, and that amount is disclosed after the Minnesota Grain Company had applied the value of the elevators and the grain in elevators upon the indebtedness of Gribbin-Alair Grain Company, to the P. B. Mann Company and to the Minnesota Grain Company. At this time it appearing that the Minnesota Grain Company had taken over the indebtedness of the Gribbin-Alair Company to the P. B. Mann Company and held it against the Gribbin-Alair Company, all of which seems to have been agreed to and the books were closed, and the business has proceeded upon that theory. Now, here is $36,548.68. If Mr. Lahart has assigned his stock of $10,000 to the Minnesota Grain Company absolutely without any condition, then Mr. Lahart has no interest whatsoever in that amount at this time, because the Minnesota Grain Company has purchased upon that theory his interest in the Gribbin-Alair Company stock, and had secured the stock and were in the possession of the same. Upon the theory, however, which I have followed and adopted in this case, that this stock was assigned to the Minnesota Grain Company, as security only, then Mr. Lahart would be entitled to receive in this action one-third interest in $36,548.68, which amount would be $12,182.89, which would be his after he had paid the indebtedness of $10,000, with interest on the amount. But in this case, looking at it from the most favorable standpoint for Mr. Lahart, and considering that the assignment of his stock was made as security, the record shows about as follows: That he owes the Minnesota Grain Company $10,000, and that he owes them the further sum of over $3,000 on a book account, making the sum of several hundred dollars at least in excess of $12,182.-

89, and in this action he is clearly not entitled to recover anything. The defendant in this case has not asked for any affirmative relief against Mr. Lahart's account, and of course will be awarded none. But under this state of facts Mr. Lahart is not entitled to recover anything."

After a careful examination and consideration of the evidence we find that the material facts summarized are established by the evidence. In fact the ultimate deductions drawn by the trial court are the only ones which could have been drawn by any reasonable, fair-minded man. The judgment appealed from is clearly right and must be affirmed. It is so ordered.

GRACE, J. (dissenting). I am unable to agree with the conclusion reached by my associates in this case. Being the only one of the judges who dissents, I feel it is not necessary to go greatly into detail. I feel fully convinced that the accounting is neither complete nor correct. The defendant undertakes to defend upon two main grounds: First, that the plaintiff had $10,000 in stock in the Gribbin-Alair Grain Company which was turned over in settlement of his debt with the Minnesota Grain Company. Then there is another theory the defendant relies upon, that the stock of the plaintiff was turned over as security, and that all the property, such as the elevators, grain, etc., had been sold and the proceeds fully accounted for to the plaintiff. The defendant's case veers back and forth between these two defenses. It seems to rely part of the time upon the $10,000 stock transfer as being absolute, and then again it abandons that idea and concedes taking the property as security, and claims it had fully accounted to the plaintiff for all such property of the plaintiff, which was turned over to the defendant, or which came into its possession.

Books of account, when well kept, and when demanded willingly produced in evidence, when such books contain the original entries, and proper proof is made thereof, and such books properly offered in evidence, are entitled to some weight and credit. It is shown by competent testimony in this regard that Mr. Brice, an attorney of Minneapolis, acting for Mr Lahart, sought to examine the books in connection with this accounting.

Mr. Lahart and Mr. Brice went up to Gunderson's office, and Mr. Lahart testifies positively that he heard Mr. Gunderson order him out of the office.

Q. Did you hear Mr. Gunderson order him out of the office?

A. Yes, sir. ·Heard him tell him that he had no business looking at what he did. He wanted to look at some letters—wanted this letter. Wished to get some papers, and Mr. Gunderson told him to get out of the office and stay out.

It appears from the testimony that the letter referred to was finally brought forth, and it also appears that Brice made some examination of the books, either by himself or through some accountant. Other testimony with regard to the books, and very pertinent, is as follows:

Q. You heard the statement of counsel that the books were always open to inspection, did you not?

A. Yes, sir.

Q. You may state what was done about examining the books, whether you examined them.

A. Must be I went down there a dozen times to call on Mr. Gunderson at his office. He would never let me see the books. Never let me go through them.

Q. How long did you stay out any of the times you were down there?

A. Two weeks sometimes.

Q. Did you ever get access to any of these books?

A. No, sir.

Q. Did you ever get access to the books?

A. No, sir.

Q. When was that?

A. In 1909, or a year later.

Q. Sometime in 1909?

A. Along in August, 1909.

Q. And about a dozen times, or ten or eleven times besides you were there to see them and never got to view the books?

A. No, sir. Never saw them.

There is nothing in the record to show but that Mr. Lahart is a good straightforward citizen. His integrity and truthfulness is no-

where attacked. In view of such testimony it is idle for the defendant to contend that they have been perfectly willing to throw open their books to the plaintiff, or that they have been willing to enter into an accounting with him and to fully and fairly account to him for all his property received by them. After June 7, 1907, when the plaintiff had ceased to be actually associated with the Gribbin-Alair Company, he had no control over the books, and sometime after that date they were sent down to Minneapolis, and the testimony derived from the books under all the circumstances of this case is not entitled to be considered, the only method by which proof may be had of the matters in dispute or involved between the plaintiff and the defendant. The plaintiff positively testifies that, at the time the elevators were turned over, there was in them grain of the value of $30,000. The plaintiff and Alair went to these elevators, and Lahart measured the grain and weighed the grain up in one elevator. They went home and Lahart figured it up, Alair being present when the figuring was done and saw the figures, and Lahart said there was $30,000 worth of grain.

Alair also testified as follows:

Q. Have you investigated, and have you information, and from the information had at that time, can you state how much wheat on your information there was in those elevators in value?

A. I could not state exact at all.

Q. What is your best judgment?

A. I think there ought to have been close to $30,000 worth of wheat. I can tell if I see the ledger.

We have therefore these two men, each of whose testimony is unimpeached, testifying that there was $30,000 worth of grain in the elevators at the time they were turned over. After the 7th of June, Lahart was not actually connected with the operation of the elevators, but Alair was. He still continued to remain a part of the Gribbin-Alair Company, and his testimony entirely confirms that of Mr. Lahart. There is no testimony to dispute this.

Thompson, the expert, testifies as follows:

Q. It is absolutely impossible to tell from that record what grain was actually in the warehouse?

A. Unless you follow it up to the end of the season whenever they closed out.

So that it appears that the only way the expert had of telling what grain was in the elevators on June 7th would be to have the business continued from June 7th until the end of the year, and from that make a deduction of what amount of grain was on hand June 7th. We are fully convinced that his testimony with reference to what grain was in the elevators on June 7th falls far short in weight of that of Lahart and Alair. It cannot be disputed that the amount of grain in bin may not be accurately and exactly determined by measurement, but it can be so determined approximately. A farmer may have a bin in his granary of certain dimensions. He may not be able to tell exactly the number of bushels in said bin, but it is safe to assume that if he knows how to measure a bin he may do so, and the result of his calculation will be but a very few bushels from being in accordance with the actual number of bushels in such bin as determined by weighing it. As we view the matter, there was $30,000 worth of grain in those elevators shown to have been there by competent testimony of two witnesses, and we are candid in saying that we believe there has been no fair or full accounting thereof. In addition to this, Mr. Gunderson shows at one place of his testimony that he received $15,000 from the Gribbin-Alair Grain Company which he never paid back.

We will set out his testimony in this regard as well as that relating to an additional amount of $33,339:

Q. Mr. Gunderson, do you know of drawing out from the Gribbin-Alair Grain Company on your own account $10,000?

A. Yes, sir.

Q. Did you one time draw out the amount of $5,000?

A. I think so. Yes, sir. I charged it to my account.

Q. I understand. Just answer the question.

A. Yes, sir.

Q. And what was your account with the Gribbin-Alair you charged this to?

A. To my personal account.

Q. Is it shown on that book?

A. Yes, sir. Here. Yes, sir. Just wait half a minute. We will get this thing straight. Yes, sir, it shows here.

Q. Did you ever pay this money back?

A. No, sir.

Q. You did not?

A. No, sir, why should I? The company had gone out of business. The assets belong to me.

Q. This was charged in 1908?

A. Yes, sir.

Q. Then in speaking of the assets of the Gribbin-Alair you do not include that $15,000 with their assets?

A. Most assuredly.

Q. You have not done so in your evidence, have you?

A. Yes, sir. I figured that as on hand; I figured that cash on hand. Most assuredly do. The assets in detail. That day also assumed the Alair account. I wish you to know Mr. Maddux settled that up.

Q. You also had $33,339 yourself?

A. Yes, sir.

Q. Now, what is this Gribbin & Alair?

A. Gunderson & Alair.

Q. What is this $14,632? That really out?

A. Yes, sir.

Q. So, you really owe $37,937.58?

A. Yes, sir.

Then there is further testimony showing what the Gribbin-Alair Grain Company owed the Minnesota Grain Company, and there is testimony showing that there was a balance of $34,326.65, and the same was testified to, that that is the way it appears on the books.

Gunderson and the Minnesota Grain Company may be considered as the same interest. Gunderson was treasurer of the Minnesota Grain Company and held some other offices therein. We are fully convinced that there has not been a full accounting. There is no doubt but that Lahart is entitled to a full accounting. He is entitled to an accounting for the value of the grain in the elevators at the time they were turned over, the profits, if any, made upon the elevators thereafter until the sale thereof, and a full accounting as to the sell-

ing price and interest on all such amounts. We feel, in the interest of justice, that a new trial should be granted, and that reference should be had of all the questions in this case, and plenty of time and opportunity had to obtain a full, true, and correct account of all the matters between the plaintiff and the defendant.

## On Petition for Rehearing.

PER CURIAM. Plaintiff has filed what is denominated a "motion for rehearing," and also a supplement to such motion. Especial complaint is made of the trial court's finding, embodied in and approved in our former opinion, to the effect that the plaintiff, in addition to the $10,000 and interest, also owes a book account of over $3,000. In the supplemental motion it is said: "Plaintiff accepts the accounting for the elevators and grain, as made in the majority opinion, which settled the Gribben-Alair debt, and left a fund of $36,548.68, one third of which belongs to the plaintiff, with $10,000 against it, but no $3,000 against plaintiff's interest; for that is a part of the original debt of $24,000 and twice settled by agreement of the parties."

It is true there were two settlements, but we are entirely satisfied that the book account in question has not been paid by the plaintiff. The first settlement was made on June 7, 1907, when plaintiff executed the assignment of his interest in the Gribben-Alair Grain Company, which is set out in the former opinion herein. Under the terms of the settlement then made, the plaintiff adjusted his personal indebtedness to the defendant company. He remained indebted to it in the sum of $10,000, and it was as security for this debt that he assigned his interest in the Gribben-Alair Grain Company. The existence of this $10,000 debt is one of the few things which is conceded by both parties. It should be remembered that the settlement made on June 7, 1907, had reference only to the *personal* indebtedness of the plaintiff to the defendant company, and had nothing to do with the indebtedness of the Gribben-Alair Grain Company. In order to clarify certain matters which will hereafter be referred to, it should be mentioned that the Minnesota Grain Company shortly after June 7, 1907, sold and assigned the $10,000 claim which it held against the plaintiff to G. B. Gunderson, and he has since remained the owner.

thereof and the holder of the security therefor. The undisputed evidence also shows that Gunderson subsequently and prior to the commencement of this action purchased the interests of Gribben and Alair, who together owned the remaining two-thirds interest in the Gribben-Alair Grain Company. (While some question was raised by the trial court during the course of the trial as to whether the action should not have been brought against Gunderson rather than against the defendant company, the defendant did not at all insist on or raise the point, and seemed to be desirous only of having the question of the ultimate liability of either itself or Gunderson determined; and the parties treated Gunderson and the Minnesota Grain Company as one for the purposes of this action, and the only question sought to be litigated was what amount, if any, is coming to the plaintiff by reason of the security which he assigned to the Minnesota Grain Company on June 7, 1907.)

The second settlement was made on March 10, 1909. The plaintiff had commenced an action on December 31, 1908, in the district court of Eddy county for an alleged conversion of the elevators involved in this controversy. Thereafter a settlement was made. The settlement was in writing. It was introduced in evidence upon the trial of this action, and bears date March 10, 1909. It was executed by both the parties to this action, and also by the Gribben-Alair Grain Company and G. B. Gunderson. The agreement specifically provides: *"That J. W. Lahart shall pay all his indebtedness to the Gribben-Alair Grain Co. as evidenced by notes and accounts that they may have against him."* The agreement further provides: "The Gribben-Alair Grain Company shall as speedily as possible go into liquidation and dispose of all their property, collect all outstanding bills and pay all indebtedness; that G. B. Gunderson shall pay to J. W. Lahart one third of the assets of said Gribben-Alair Grain Company, when so liquidated except $10,000, with interest from June 1, 1907, at 6 per cent, the same being the amount paid by him at that time to the Minnesota Grain Company, for account of J. W. Lahart for a one-third interest in the Gribben-Alair Grain Company." It will be noted that the agreement specifically provides for the payment by Lahart of his indebtedness,—"as evidenced by notes and accounts,"—to the Gribben-Alair Grain Company. Obviously there was some reason for in-

serting the provision in the agreement. And the evidence adduced in this case shows that Lahart, at the time the agreement was executed, was indebted to the Gribben-Alair Grain Company in the sum of $5,-171.50, and that $3,171.50 of this indebtedness was upon account. The evidence also shows that this account has never been paid. In fact, plaintiff admitted the existence of this account, and also that a judgment had been obtained thereon against him in favor of the Gribben-Alair Grain Company, and that such judgment "is standing" against him. Hence, while it is true, as asserted in the petition for rehearing, that there were two settlements, it is equally true that the last settlement expressly recognized the existence of an account against the plaintiff, in favor of the Gribben-Alair Grain Company, which plaintiff agreed to pay. The undisputed evidence, including plaintiff's own admission, shows that this debt is still unpaid. While the reference to the account in the trial court's statement made orally at the close of the trial (and embodied in the former opinion herein) may be somewhat vague, the findings of fact are clear and specific, and leave no room for doubt as to what account the court had in mind. The finding relating to this matter reads: "After the closing out of the business of the Gribben-Alair Grain Company, as aforesaid, the payment of said indebtedness to the defendant, including the claim of the P. B. Mann Company taken over by it, there remained on hand on January 1, 1908, net assets and equities amounting to $36,548.68. That, included in said net amount of assets and equities, however, was the said sum of $3,171.50 owing by the plaintiff Lahart, which was not paid by him. That the plaintiff's one-third interest in said net assets on January 1, 1908, would be $12,182.89 upon payment being made by him of said $3,171.50. That the said indebtedness of $10,000 to the defendant, with interest from June 7, 1907, to January 1, 1908, amounted to $10,388.60, which amount together with said $3,171.50 would make a total amount of $13,550.10. That the accounting prayed for in this action accordingly shows of the date of January 1, 1908, the sum of $12,182.89 to the credit of the plaintiff and $13,550.10 to his debit."

In view of the facts stated, it is somewhat difficult to understand the reason for the assertions in the petition for rehearing with respect to the book account.

The plaintiff still claims that he has not received his share of the assets of the Gribben-Alair Grain Company. There is, however, no question as to what was received from the sale of the elevators. And while the plaintiff claims that there was a great deal more grain in the elevators on June 7, 1907, than has been accounted for, there seems to be no real basis for his claim. Certainly the evidence which he offered falls far short of sustaining the contention made. The only evidence offered by the plaintiff upon this proposition was his own testimony and that of Alair and O'Neill. Alair was the general manager of the Gribben-Alair Grain Company, and O'Neill was the man in charge of the elevator at Sykeston. When the plaintiff was first asked by his counsel as to the grain on hand in the elevators on June 7, 1907, he answered: "Yes, sir; there were several thousand bushels, *there must have been.*" A little later he stated: "We estimated there was about $35,000 worth of grain in all of the elevators." A little later (on the same page of the transcript) he states that there was "probably $20,000 worth of grain" in the elevator at Sykeston, and $20,000 worth of grain in the other elevators. (It will be noted that there is a difference in value of $5,000, in a few moments,—and all during his direct examination.) In this connection it may be mentioned that O'Neill, who had charge of the Sykeston elevator from the fall of 1906 up to and subsequent to June 7, 1907, when called as a witness in behalf of the plaintiff, testified that in his judgment there was only about 300 bushels of grain in the Sykeston elevator on June 7th. The only elevator in which the plaintiff testifies that the grain was weighed was in the elevator located at Heaton. In the others, he says, it was measured and figured. He admits that there was quite a number of storage tickets outstanding, and that some of the grain on hand was represented by such storage tickets, and that such grain belonged to the owners of the tickets.

When Alair (who was called as a witness by plaintiff) is asked how much grain there was in the elevators, he answers: "I could not tell just how much grain there was in them, the actual amount, no; only just an idea as Mr. Lahart made an examination and he gave it to me. He asked me if there was enough grain to pay out. I said I did not know. He asked me to go along with him and measure up the houses. We went out and measured up the houses *roughly.*" In answer to

another question, requesting him to give his best judgment as to the amount of grain on hand, after giving an estimate, he says: "I can tell if I see the ledger." The ledger referred to was a book kept by the Gribben-Alair Company at its office at New Rockford. This ledger was afterwards produced in court, and introduced in evidence by the defendant, and the expert accountant, Thompson, repeatedly referred to it in his testimony. He (Thompson) said that the so-called ledger "contains a complete statement of the grain in the elevators on June 7, 1907." This is in harmony with the statement of Alair that he could tell the amount of grain on hand if he could see this ledger. How can it be seriously contended that the evidence adduced by the plaintiff does in fact establish the amount of grain on hand in the elevators on June 7, 1907?

On the other hand, the defendant produced books of account showing the various receipts and expenditures. It also put upon the stand Gunderson, who testified as to these matters, as well as Mr. Thompson, an expert accountant of recognized ability, who went thoroughly into the matters in controversy. He based his testimony as to the amount of grain on hand on June 7, 1907, upon the books of the Gribben-Alair Grain Company as kept by it prior, and up to June 7, 1907. The Gribben-Alair Grain Company was awarded all profits reflected by "overages." Thompson explained the method used by him in determining the amount and value of the grain on hand on June 7th. When asked: "When you make your calculation as I understand it, you give the plaintiff the benefit of any doubt as to overages?" he answered: "Yes, sir, in every case." According to the computations made by Thompson the assets of the Gribben-Alair Company on January 1, 1908, amounted to $36,548.68. And this amount—as he explained—included the account of $3,171.50 against the plaintiff, to which reference has heretofore been made.

Alair testified as follows with respect to the grain shipments:

Q. Then, isn't it a fact that all the grain that was on hand, whatever amount that might have been in those seven elevators, was shipped out either to the P. B. Mann Company, or to the Minnesota Grain Company, and that the amount was received by the Gribben-Alair Company as to those sums?

A. Yes; we always got an account sales.

. . .

Q. You saw the account sales of the Gribben-Alair Grain Company shipped to or received by the Minnesota Grain Company? For all shipments?

A. Yes, sir; all the cars shipped received account sales of the shipments.

It should be noticed that the Gribben-Alair Grain Company was a going concern. It was operating elevators at seven different points in the state. It had its headquarters at New Rockford. It maintained a bookkeeper and kept its books at that place, and the different buyers in the different elevators made reports to that office. According to the understanding between the parties, all grain on hand on June 7, 1907, was shipped out, and it is undisputed that all grain had been shipped out, and also five of the elevators sold before the end of August of that year. Hence, when plaintiff entered into the settlement agreement on March 10, 1909, all moneys from the sale of grain and from the sale of the five elevators had been received. If plaintiff's contentions in this case are correct these sums would have more than paid off all debts of the Gribben-Alair Grain Company, and plaintiff's distributive share of the surplus would have more than paid off his entire debt. It is somewhat strange that the terms of the agreement are as set forth, if the plaintiff at that time actually believed the contentions which he now claims to be true.

Some reference has been made in this case to the fact that Gunderson refused to permit the plaintiff or his attorney to examine the books of the Minnesota Grain Company. It is not apparent how this could affect the admissibility of the books in evidence. In this connection it may be noted, however, that Gunderson denied that he refused to permit such examination, and claimed that he permitted Brice (Lahart's attorney) to examine them, and even to take some of them to his office. And Lahart admits that he was informed by Brice to the effect that he had been permitted to examine the books. Lahart testified: "Mr. Brice said he had got the books, that Mr. Gunderson let him have the books. He had a man in his office go through everything. He said he acted real good and let him go through everything."

Reference has also been made to the fact that Gunderson admitted that he had drawn some money out of the Gribben-Alair Grain Company's assets. The record fully discloses what was done. Gunderson was asked to give the then condition of the Gribben-Alair Grain Company. He says: "There is on hand, $23,339.30, and Gunderson and Alair have, and it is practically myself, same thing,—$14,637.28, the total assets are $37,967.68; indebtedness to the Minnesota Grain Company, $6,349.93, making the net worth $34,326.65. In addition to that, have an account against J. W. Lahart which is in the form of a judgment for $3,231.50." On his cross-examination he admits that he has drawn out some money and charged it to his account. Just what was wrong about that is hard to understand. He owned two thirds of the assets outright and absolutely, and he had a lien for over $10,000 against the other one third. This lien exceeded the full amount of such interest, so Gunderson was in fact the owner of all the assets. In his testimony Gunderson was referring to entries made in books of account, which were offered in evidence. These are the same books upon which the expert accountant based his testimony, and the books are part of the record transmitted to this court.

Our reconsideration of this case on the petition for rehearing has merely confirmed our convictions that the judgment appealed from is right. The conclusion reached in our former decision must stand. A rehearing is denied.